UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------- x

E.H.C.F., a Minor, by his next friend, MILEIDY :
YAMALY CONTRERAS FLORES,                        :
                                                :
                         Petitioner-Plaintiff, :      **MEMORANDUM &
                                                :      ORDER**
         -against-                              :
                                                :      3:25-CV-2142 (VDO)
ROBERT F. KENNEDY, JR., in his official capacity as:
Secretary of Health and Human Services; ANGIE :
SALAZAR, in her official capacity as Acting Director:
of the Office for Refugee Resettlement; REGINA :
MOLLER, Director of Noank Community Support:
Services; U.S. DEPARTMENT OF HEALTH AND:
HUMAN SERVICES; U.S. OFFICE OF REFUGEE:
RESETTLEMENT;    NOANK    COMMUNITY:
SUPPORT SERVICES; KRISTI NOEM, in her official:
capacity as Secretary of Homeland Security; U.S.:
DEPARTMENT OF HOMELAND SECURITY,                :
                                                :
                    Respondents-Defendants.  :
---------------------------------------------------------------- x

**VERNON D. OLIVER**, United States District Judge:

Before the Court is the Petitioner-Plaintiff's Motion for a Temporary Restraining Order

and Preliminary Injunction (the "Motion") (ECF No. 5). Petitioner-Plaintiff E.H.C.F., a minor,

by his Next Friend and mother, Mileidy Yamaly Contreras Flores, seek an order compelling

the Respondents-Defendants to release E.H.C.F. into the custody of Ms. Contreras Flores. For

the reasons that follow, the Court **GRANTS** the Motion.

Having considered the record and based on the January 15, 2026, evidentiary hearing,

the Court issues the following findings of fact and conclusions of law under Federal Rule of

Civil Procedure 52(a)(2).

## I.      BACKGROUND

### A.      Findings of Fact

#### 1.      E.H.C.F.'s Background

E.H.C.F. was born in Honduras in 2009.[1] He came to the United States with his mother, Ms. Contreras Flores, in 2019.[2] Upon arriving at the United States' border, after being briefly separated and detained by immigration officials, E.H.C.F. and his mother were released and immediately went to Chelsea, Massachusetts.[3] Up until the events that led to the underlying habeas petition in this action, E.H.C.F. resided in Chelsea for six years with his mother, father, and two siblings.[4] E.H.C.F. attended public school.[5] All members of the family, including E.H.C.F., his mother, and his father, have active asylum applications pending.[6]

#### 2.      E.H.C.F.'s Detention and Time in Custody

On May 8, 2025, following a dispute with his peers, E.H.C.F. was arrested by the Chelsea Police Department.[7] At 15 years of age, this was his first and remains his only arrest.[8] Ms. Contreras Flores received a call from her son at the police station, and he told her of his arrest and that an adult needed to pick him up. Ms. Contreras Flores, who was at work at the time, asked her husband, E.H.C.F.'s father, to pick him up. Upon arriving at the Chelsea Police

---

[1] *See* Decl. of Mileidy Yamaly Contreras Flores, ECF No. 39 ¶ 7.

[2] *See id.*

[3] *See id.*

[4] *See id.* ¶ 8.

[5] *See id.*

[6] *See id.* ¶ 10.

[7] *See id.* ¶ 11.

[8] *See id.* The arrest resulted in charges that were later dismissed. *See* Ex. E, ECF No. 21 at 31.

2

Department, E.H.C.F.'s father was asked to wait for up to an hour. Shortly thereafter, United States Immigration and Customs Enforcement ("ICE") agents detained both E.H.C.F. and his father.[9]

On the following day, E.H.C.F. was transferred from ICE custody in Burlington, Massachusetts, to the custody of the Office of Refugee and Resettlement ("ORR") in San Antonio, Texas.[10] The facts surrounding notice to Ms. Contreras Flores of E.H.C.F.'s detention are disputed and addressed in further detail in Section III.2.a, *infra*. Upon his initial detention by ICE and until a few days after he arrived in San Antonio, E.H.C.F. did not have his mother's phone number and was unable to speak with her.[11] He reported to ORR that ICE confiscated his phone and did not return it.[12]

Throughout his time in San Antonio, after obtaining his mother's phone number, E.H.C.F. spoke to Ms. Contreras Flores on the phone nearly every day.[13] He reported to her that he felt trapped there.[14] E.H.C.F. also reported to Dr. McNamara, a physician and psychiatrist who evaluated him in December 2025, that he "struggled with significant anxiety and insomnia" during his time at the facility in San Antonio.

On August 7, 2025, ORR transferred E.H.C.F. to the Noank Community Support Services facility in Mystic, Connecticut ("Noank").[15] Noank is a 12-bed home, where children

---

[9] *See* Decl. of Mileidy Yamaly Contreras Flores, ECF No. 39 ¶ 12.

[10] *See id.* ¶ 15.

[11] Exhibit A to Pl.'s Reply, ECF No. 32 at 2.

[12] *Id.*

[13] Decl. of Mileidy Yamaly Contreras Flores, ECF No. 39 ¶ 56.

[14] *Id.*

[15] *Id.* ¶ 30.

between the ages of 0-17 in ORR custody reside. The children are divided among three bedrooms.

Noank "provides education services" to the children it houses "through a teacher, an assistant teacher, a recreation coordinator, and two staff to assist with classroom activities."[16] Though "[i]ndividual education plans are developed for each child,"[17] they all receive their education at an L-shaped table in a common room of the home, that also serves as the facility's dining room. Most children are Spanish-speaking; some also speak varying levels of English; and others' first and preferred language is neither English nor Spanish. As a result, Noank's single teacher and assistant teacher are tasked with educating children of vastly different ages and English-language proficiencies simultaneously. Instruction therefore remains necessarily rudimentary—for example, teaching all students at once, from kindergarten-age children to sixteen-year-old E.H.C.F., concepts such as indirect object pronouns and basic words like "the" and "a."[18]

E.H.C.F. has experienced various health issues while in ORR custody. He has received oral surgery in October 2025 to remove a lump on his lower lip.[19] But major dental issues remain, causing him pain, "which has worsened over the past few months and affects his

---

[16] Decl. of Regina Moller, ECF No. 25-2 ¶ 10.

[17] *Id.*

[18] The Court relies on, and finds credible, the testimony of Kids in Need of Defense (KIND) attorney Tess Elizabeth Reagan for these findings.

[19] Decl. of Susan McNamara, ECF No. 38 ¶ 18.

sleep."[20] E.H.C.F. has reported that he has one tooth with severe decay that needs to be pulled, as well as other teeth with cavities that need fillings.[21]

E.H.C.F. has also experienced mental health issues while in custody. In a forensic psychological evaluation conducted in December 2025, he was diagnosed with Generalized Anxiety Disorder, Major Depressive Disorder, Posttraumatic Stress Disorder, and Attention Deficit Disorder, Inattentive Type.[22] Dr. McNamara, the examiner, concluded that "[i]t is highly likely that his depressive and anxious symptoms developed as a result of his frightening arrest, and abrupt and prolonged removal from his family at the age of 15, as well as dental pain."[23] E.H.C.F. was recently prescribed a medication to help with his anxiety and depression.[24]

### 3.   ORR Sponsorship Process

### a.   Ms. Contreras Flores's Initial Sponsorship Application

On or around May 23, 2025, Ms. Contreras Flores formally initiated the reunification process to secure the release of her son by sending sponsorship application documents to ORR.[25] Those documents included an Authorization for Release of Information, a Sponsor Care Agreement, and a Letter of Designation.[26] She had previously provided ORR with a copy of her identity documents, including her Employment Authorization Card, Social Security

---

[20] *Id.*

[21] *Id.*

[22] *Id.* ¶ 37.

[23] *Id.*

[24] *Id.* ¶ 21.

[25] Decl. of Tony Biswas, ECF No. 25-1 ¶¶ 21–22.

[26] Decl. of Mileidy Yamaly Contreras Flores, ECF No. 39 ¶ 19.

Card, and Honduran Passport, as well as a copy of E.H.C.F.'s birth certificate, his vaccination records, and a selfie photo of herself.[27] Around this time, Ms. Contreras Flores also began sending ORR her pay stubs every fifteen or so days, as well as monthly utility bills.[28]

On May 27, 2025, Ms. Contreras Flores attended a biometrics appointment to submit her fingerprints to ORR. "Disqualifying factors were not identified," and she "was cleared to continue the reunification process."[29] At some point in mid-June, ORR also required both Ms. Contreras Flores and E.H.C.F. to submit to DNA testing for further proof of identity and relationship. The DNA testing confirmed, a few days later, that Ms. Contreras Flores was E.H.C.F.'s mother.[30] On June 11, 2025, a social worker from ORR came to Ms. Contreras Flores's home to conduct a home study and told her afterwards that the study "had gone well."[31] On June 15, 2025, "the home study referral was closed, and a positive recommendation was made."[32]

Around this time, Ms. Contreras Flores authorized ORR to conduct a background check.[33] Throughout E.H.C.F.'s time in ORR custody in Texas, up until August 7, 2025, Ms. Contreras Flores "regularly complied with all of ORR's requirements and participated in family counseling sessions remotely."[34]

---

[27] *Id.* ¶ 18

[28] *Id.* ¶ 19.

[29] Decl. of Tony Biswas, ECF No. 25-1 ¶ 22.

[30] Decl. of Mileidy Yamaly Contreras Flores, ECF No. 39 ¶ 26.

[31] *Id.* ¶ 24.

[32] Decl. of Tony Biswas, ECF No. 25-1 ¶ 25.

[33] Decl. of Mileidy Yamaly Contreras Flores, ECF No. 39 ¶ 22.

[34] *Id.* ¶ 29.

### b.    E.H.C.F.'s Transfer to Noank

After E.H.C.F.'s transfer to Noank on August 7, 2025, ORR informed Ms. Contreras Flores that she would have to restart the reunification process, which she began right away.[35]

On August 22, 2025, Ms. Contreras Flores attended a mandatory appointment at the Administration for Children and Families (ACF) Sponsor ID Check Office in Worcester, Massachusetts. Immediately after her appointment, she was instructed to go to the Department of Homeland Security (DHS) office at the John F. Kennedy Federal Building in Boston, Massachusetts. Ms. Contreras Flores went directly to that building and was interviewed for two hours by a DHS officer about her asylum case. After the interview, Ms. Contreras Flores was instructed to walk with a DHS official to another office in the same building, where she was served with a Notice to Appear in immigration court and a DHS Order of Supervision.

### c.    Keren's Involvement

Keren Lizeth Flores Romero, E.H.C.F.'s older sister, of adult age, was listed in Ms. Contreras Flores's initial sponsorship application as an alternate caregiver/household member.[36] Thus, per ORR policy, she was similarly required to provide identification documents and submit to a host of ORR requirements. On May 27, 2025, Ms. Contreras Flores sent a copy of her daughter Keren's Honduran Passport to ORR.[37] On June 9, 2025, Ms. Contreras Flores also submitted a copy of Keren's high school ID as an alternative identification document, and on June 16, 2025, per ORR's request, she sent Keren's birth

---

[35] *Id.* ¶ 30.

[36] *Id.* ¶ 16.

[37] *Id.* ¶ 20.

certificate.[38] On May 29, 2025, Keren attended a biometrics appointment to submit her fingerprints. Around this time, Keren also authorized ORR to conduct a background check.[39]

On July 1, 2025, "ORR received confirmation from the [Honduran] consulate of the authenticity of [Keren's] passport and birth certificate."[40] On July 22, 2025, over three weeks after receiving confirmation of the documents' authenticity, ORR informed Ms. Contreras Flores that Keren's Honduran Passport was not a sufficient identification document and asked for a copy of her library card. Ms. Contreras Flores sent a copy of that card on July 31, 2025.[41] Then, sometime in August, ORR indicated to Ms. Contreras Flores that Keren's library card was also not sufficient and asked for her college ID.[42] Ms. Contreras Flores sent a copy of Keren's ID later in August, as soon as she had received it, as Keren had only recently enrolled in college.[43]

On October 3, 2025, over a month later, ORR asked Ms. Contreras Flores for a copy of Keren's Employment Authorization Document, which she sent to ORR on the same day.[44]

---

[38] *Id.* ¶¶ 23, 25.

[39] *Id.* ¶ 22.

[40] ECF No. 25-1 ¶ 28.

[41] ECF No. 39 ¶ 28. The Government's witness, Toby Biswas, contradicts Ms. Contreras Flores's statement, indicating that "On July 31, 2025, [Ms. Contreras Flores] informed ORR that [Keren] would attempt to obtain an enhanced library card and, if unable to get that identification," Keren would provide a copy of her college ID. ECF No. 25-1 ¶ 29. Given (1) the mother's subsequent in-court testimony at the January 15, 2026, hearing, (2) the lack of presence of Mr. Biswas at said hearing and thus the Court's inability to ask him questions, and (3) that Mr. Biswas's affidavit is based on a review of the Petitioner-Plaintiff's file rather than first-hand knowledge, the Court credits Ms. Contreras Flores's statement rather than that of Mr. Biswas with respect to the provision of the library card.

[42] ECF No. 39 ¶ 28

[43] *Id.*

[44] *Id.* ¶ 36

### d.   Discovery of Father's Presence in Home

On or about June 13, 2025, E.H.C.F.'s father was released from ICE custody and returned to the family's home in Chelsea, Massachusetts.[45]

On or around September 15, 2025, Ms. Contreras Flores attended a family session with ORR as part of the reunification process. At that meeting, when asked whether her husband, Cesar Heriberto Contreras Romero, was living in the home, she immediately confirmed. Given that E.H.C.F.'s father returned to the home about two months prior, in mid-June, she "thought [she] was confirming something they already knew."[46] Specifically, she "had assumed that the government had known he was home because he had been released on bond and had been required to tell them where he would be living."[47] Ms. Contreras Flores subsequently confirmed the same during the Court's questioning at the January 16, 2026 hearing.

On October 9, 2025, over three weeks after the "discovery" of the father in the home, ORR notified Ms. Contreras Flores that they would need additional documents to conduct

---

[45] *Id.* ¶ 33, *see also* Notice of Voluntary Dismissal, *Contreras Romero v. Trump*, 1:25-cv-11351, (D. Mass. Jun. 16, 2025).

[46] ECF No. 39 ¶ 34.

[47] *Id.* ¶ 33. The Government's witness indicates otherwise, and claims that Ms. Contreras Flores "reported she did not notify ORR as she feared E.H.C.F.'s case would be compromised, and she was unsure if the release was temporary or permanent." ECF No. 25-1 ¶ 32. For the same reasons indicated in n. 41, *supra*, the Court finds Ms. Contreras Flores's statement to be credible.

Further, at the January 15, 2026 hearing, the Government indicated that ORR would have no reason to know that up until his May 8, 2025, detention by ICE, Mr. Contreras Romero was previously a household member. The Court finds otherwise. ORR's own records, from as early as May 11, 2025, when ORR was conducting intake interviews with E.H.C.F., reveal that he disclosed to ORR his family background and that ICE detained his father at the same time as him. *See* Ex. A. to Mot., ECF No. 21. Additionally, in light of the numerous family sessions conducted by ORR with E.H.C.F. and his family members as part of the reunification process, the Court cannot make the finding that ORR was not aware of E.H.C.F.'s family history and living circumstances prior to being taken into ORR custody. Indeed, that seems to have been one of the main reasons ORR was conducting these sessions.

9

background checks on Mr. Contreras Romero, as an alternate caregiver/household member.[48] They also informed her that an "addendum to the home study," i.e., a second home study, would be required.[49] Mr. Contreras Romero completed his Authorization for Release of Information on October 24, 2025, and provided his fingerprints on October 31, 2025.[50] Background checks were initiated on November 17, 2025, and ORR received the results on December 10, 2025. The second home study was conducted on December 4, 2025, and resulted in a positive recommendation.[51]

### e.    Safety Concerns

As described above, E.H.C.F. entered ORR's custody on May 11, 2025. On that day, E.H.C.F. disclosed certain safety concerns to his ORR case manager.[52] E.H.C.F. raised these concerns again on September 12, 2025 in an interview with ORR, and he later touched on these concerns with a clinician he met with on December 16, 2025.[53] Based on these concerns, in a prior family session with ORR, Ms. Contreras Flores "had talked about safety planning and strategies to ensure that E.H.C.F. feels supported, including all [his family members] being

---

[48] ECF No. 25-1 ¶ 33.

[49] *Id.*

[50] *Id.* ¶¶ 34, 35.

[51] ECF No. 39 ¶ 37.

[52] *See* Ex. A. to Reply, ECF No. 32.

[53] *See* ECF No. 25-1 ¶¶ 31, 37.

ready to call the police if there was any threat[.]"[54] Ms. Contreras Flores has indicated that she and her husband have made a safety plan for when their son returns home.[55]

### f. Prior Relevant Determinations and Recent Events

At the January 15, 2026, evidentiary hearing, Ms. Contreras Flores testified that at some point in September 2025, she was told by ORR that E.H.C.F. was being released from ORR custody and was coming home. Around the same time, ORR inquired of Ms. Contreras Flores whether she had a dentist, mental health provider, and pharmacy lined up for E.H.C.F. in Chelsea, Massachusetts. ORR then reversed its decision, but Ms. Contreras Flores wasn't informed as to why.

Most recently, the second home study of Ms. Contreras Flores's home resulted in a positive recommendation, as had the first home study back in June 2025.[56]

On December 11, 2025, Federal Field Specialist Ruth Yanez, one of the ORR employees responsible for overseeing case coordination, resolving disagreements among stakeholders, and issuing final decisions on transfer and release requests of children in ORR

---

[54] ECF No. 39 ¶ 43.

[55] *Id.* ¶¶ 44–48 (describing how in the mornings, Ms. Contreras Flores will take E.H.C.F. to school, either by walking with him or paying for an Uber. In the afternoons, with Ms. Contreras Flores's assistance in signing up, E.H.C.F. will attend after school programs, like playing on the basketball team. After these activities, Mr. Contreras Romero will get off work, pick E.H.C.F. up, and go home with him. On days with no after school activities, E.H.C.F. will Uber home and Keren, who is taking online college classes at home, will supervise him until Mr. Contreras Romero returns home from work). Petitioner-Plaintiff also provides a letter from Roca, a local program to disrupt cycles of violence amongst young men in the community, where E.H.C.F. will be enrolled when he is released from ORR custody. *See* Exhibit F. to Reply, ECF No. 32.

[56] ECF No. 37 ¶ 24, 36

custody, who had been assigned to the case in around September 2025, "uploaded her positive sponsor suitability determination."[57]

On December 15, 2025, Noank submitted its positive recommendation.[58]

On December 16, 2025, Young Center attorney Stefany Victoria Dicktiar Canales, who had been appointed as E.H.C.F.'s Child Advocate in October 2025, issued a Best Interests Determination (BID) "in support of the immediate release of [E.H.C.F.] to his mother."[59]

On December 18, 2025, Ms. Contreras Flores's second set of background checks (the first set had expired due to the length of time that had passed since Ms. Contreras Flores's initial application) were updated to ORR's portal.

On December 15, 2025, December 16, 2025, and December 22, 2025, ORR remanded the decision on E.H.C.F.'s release, meaning they made the decision to deny release pending further consideration of his case.[60] No explanation was provided for these remands.[61]

On December 25, 2025, ORR asked Ms. Contreras Flores for a new utility bill, which she sent over on the same day.[62] On December 29, 2025, ORR asked Ms. Contreras Flores to again provide information about E.H.C.F.'s mental health provider, dentist, and pharmacy "for when he returns home."[63]

---

[57] *Id.* ¶ 21, 37.

[58] *Id.* ¶ 38.

[59] *Id.* ¶ 40.

[60] *Id.* ¶ 43.

[61] *Id.*

[62] ECF No. 39 ¶ 40.

[63] *Id.* ¶ 41.

On December 30, 2025, ORR first indicated to Ms. Contreras Flores that the agency needed more time to review her application because of the safety concerns described in Section I.A.3.e, *supra*.[64]

On January 5, 2026, at 4:41 P.M., Ms. Contreras Flores received a call from Noank telling her to come and pick up her son. A representative from Noank then texted her an address and asked when she would be there.[65]

18 minutes later, on January 5, 2026, at 4:59 P.M., Ms. Contreras Flores received another call from Noank, letting her know "there had been a mistake, and that [E.H.C.F.] would not actually be released that evening."[66] The caller indicated they would follow up soon.[67] As of the hearing that took place on January 15, 2025, Ms. Contreras Flores had heard nothing.

On January 16, 2026, Petitioner-Plaintiff provided a copy of a discharge plan put together by Noank three days prior, wherein Noank clinician Joselyn Torres, who has extensively treated E.H.C.F., "recommends reunification with his parents, as the minor has successfully met therapeutic goals and does not represent a risk to the community or society."[68]

### B.    Procedural History

On December 22, 2025, Petitioner-Plaintiff E.H.C.F. filed his initial petition for writ of habeas with this Court.[69] He filed an amended petition for writ of habeas on December 30,

---

[64] *Id.* ¶ 42

[65] *Id.* ¶ 50.

[66] *Id.*

[67] *Id.*

[68] ECF No. 48.

[69] *See* ECF No. 1.

2025, adding Respondents-Defendants Kristi Noem, in her official capacity as Secretary of Homeland Security, and the Department of Homeland Security.[70]

On December 23, 2025, Petitioner-Plaintiff E.H.C.F. the instant Motion, seeking his release to the custody of his mother.[71] Respondents-Defendants responded on January 5, 2026.[72] E.H.C.F replied on January 9, 2026.[73] The Court held an evidentiary hearing and argument on the Motion on January 15, 2026. On the following day, Petitioner-Plaintiff and Respondents-Defendants each filed supplemental briefing.[74]

## II.    <u>LEGAL STANDARD</u>

A motion for a temporary restraining order (TRO) is "an extraordinary and drastic remedy." *Students for Fair Admissions v. U.S. Mil. Acad. W. Point*, 709 F. Supp. 3d 118, 129 (S.D.N.Y. 2024) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)); *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam). It is "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

"In the Second Circuit, the standard for issuing a TRO is the same as the standard for the issuance of a preliminary injunction." *Fairfield Cty. Med. Ass'n v. United Healthcare of New England*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), *aff'd as modified sub nom.,* 557 F. App'x 53 (2d Cir. 2014). A party seeking a TRO or preliminary injunction that "will affect government action taken in the public interest pursuant to statute or a regulatory scheme" must

---

[70] *See* ECF No. 19.

[71] *See* ECF No. 5.

[72] *See* ECF No. 25.

[73] *See* ECF No. 30.

[74] *See* ECF No. 52 for Petitioner-Plaintiff's filing; and ECF No. 50 for Respondents-Defendants' filing.

demonstrate: (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, (3) public interest weighing in favor of granting the injunction, and (4) that the balance of equities tips in its favor. *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279–80 (2d Cir. 2021), *opinion clarified* 17 F.4th 368 (2d Cir. 2021); *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020).

"The injunction will only be granted if both irreparable harm and a likelihood of success on the merits are shown." *Nat'l Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63, 75 (D. Conn. 2023) (citing *Plaza Health Lab., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989)); *see also Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir. 1985) ("Even if we were to agree that plaintiffs' likelihood of success is as clear as the district court concluded, on this record plaintiffs still failed to establish the irreparable harm essential to entitle them to the extraordinary relief of a preliminary injunction.").

## III.    DISCUSSION

The Court now turns to whether a TRO and preliminary injunction is warranted. As discussed below, the Court concludes that all factors weigh in favor of Petitioner-Plaintiff and accordingly **grants** the Motion.

### 1.    Irreparable Harm

Petitioner-Plaintiff E.H.C.F. is likely to suffer irreparable harm that cannot be remedied in the absence of a preliminary injunction.

In order to satisfy the irreparable harm requirement, a plaintiff must "demonstrate that absent a preliminary injunction [it] will suffer an injury that is . . . actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). "Where there is an

adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore v. Consol. Edison Co. of N.Y.,* 409 F.3d 506, 510 (2d Cir.2005). "Irreparable harm may be found where damages are difficult to establish and measure." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).

"Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (cleaned up). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (quoting 11 C. Wright & A. Miller, Federal Practice and Procedure, § 2948, at 440 (1973)); *accord Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Continued separation of E.H.C.F., a sixteen-year-old child, and Ms. Contreras Flores irreparably harms them both. Money damages cannot repair the harm to familial integrity. *See Stanley v. Illinois*, 405 U.S. 645, 647 (1972) (delay in parental custody causes intangible deprivation, uncertainty, and dislocation). E.H.C.F. has undoubtedly already experienced severe psychological harm based on his separation from his family, only exacerbated by the dental pain he is experiencing. And he has now missed over half a year of high school. The Court finds that, especially in light of E.H.C.F.'s diagnosis of Attention-Deficit disorder, the education conditions at Noank have likely stalled his educational progress at a critical time in his development.

16

The harm to the Respondents-Defendants in immediately placing E.H.C.F. with his mother is negligible. There is no dispute that she is E.H.C.F.'s parent and she is fit. Indeed, numerous positive recommendations from multiple stakeholders, including ORR FFS Ruth Yanez, have repeatedly indicated the same. The government's interests in completing certain unnamed additional procedures to be sure that E.H.C.F. is released "safely" or to complete "additional vetting" do not outweigh the family's interest in reuniting. Moreover, despite being provided the opportunity to do so, the Government has not explained what exact "additional vetting" needs to take place for E.H.C.F. to be released to his mother, or what ORR's "investigation" as to the safety concerns in E.H.C.F.'s matter entails.

For the foregoing reasons, the Court finds that Petitioner-Plaintiff has established that the harm he has already experienced and continues to experience, will not be remedied absent injunctive relief.

### 2.      Likelihood of Success on the Merits

Petitioner-Plaintiff is likely to succeed on the merits, as explained below. "In general, to establish a 'likelihood of success on the merits' the movant for injunctive relief 'need only make a showing that the probability of his prevailing is better than fifty percent.'" *Abrams v. Waters*, No. 17-CV-1659 (CSH), 2018 WL 1469057, at *4 (D. Conn. Mar. 26, 2018) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)).

### a.      Unaccompanied Alien Child Designation

At the outset, the Court notes that it is unclear from the record whether E.H.C.F. was ever properly classified as an Unaccompanied Alien Child ("UAC") and whether ORR ever had the authority to hold him in their custody.

Under the Homeland Security Act (HSA) and Trafficking Victims Protection Reauthorization Act (TVPRA), ORR is responsible for "making placement determinations for all [UACs] who are in Federal custody by reason of their immigration status." 6 U.S.C. § 279(b)(1)(C). The TVPRA directs that "the care and custody of all [UACs], including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary" of HHS. Id. § 1232(b)(1). Furthermore, "any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to [HHS] not later than 72 hours after determining that such child is an unaccompanied alien child." Id. § 1232(b)(3).

The HSA defines a UAC (and the TVPRA incorporates this definition by reference) as a child who "(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2). That E.H.C.F. has no lawful immigration in the United States and has not attained 18 years of age is not in dispute. However, the Court cannot conclude from the record that there was ever a time when E.H.C.F. had "no parent or legal guardian in the United States…available to provide care and physical custody."

Indeed, E.H.C.F. has two such parents. Upon his initial arrest by the Chelsea Police Department, E.H.C.F.'s father was admittedly detained, though it is unclear from the record why that occurred. Ms. Contreras Flores maintains that she did receive a phone call from someone on May 9, 2025 after E.H.C.F. was transferred into DHS custody, telling her that

18

Petitioner was detained at Burlington, but did not receive any instruction to pick him up.[75] By the time she next heard about his son's whereabouts, he was already in San Antonio, Texas.[76] Assuming this version of events is true, E.H.C.F. was not properly designated as a UAC because DHS and/or ICE did not conduct its due diligence in attempting to locate Ms. Contreras Flores. And E.H.C.F. was himself unable to contact his mother, as ICE confiscated his phone and did not return it, and he did not remember his mother's phone number.

The Government tells a very different and quite disturbing story. According to ICE Supervisory Detention and Deportation Officer Karen F. O'Donnell, Ms. Contreras Flores was "also encountered at the time of the arrest of minor, however, she was not taken into custody due to having a different minor child with her."[77] Assuming this was true, the Court is unclear why E.H.C.F. was not released to her then.

Officer O'Donnell then indicates that on May 9, 2025, at 12:15 P.M., an ICE agent "agreed that both parents are subject to ICE deportation," not listing a reason as to why, and that at 12:38 P.M., notwithstanding this determination, a separate agent nevertheless informed the Boston DHS Enforcement and Removal Operations office that it should "contact the petitioner's parent and have them report to pick them up."[78] Disturbingly, the Government contends that Ms. Contreras Flores was told to report to ICE at 8 A.M., seemingly to pick up

---

[75] *See* ECF No. 39 ¶ 13.

[76] *Id.* ¶ 15.

[77] ECF No. 50-2 ¶ 21(e). The Court notes that Officer O'Donnell's declaration is full of significant incongruities. *See, e.g.,* ECF No. 50-2 ¶ 21 (indicating that "Mother, reported to ERO on 5/27/2022 given future report date." The Court does not understand what this means, whether the 2022 date is accurate, and why this report is mentioned in the context of the events that transpired on May 8-9, 2025).

[78] *Id.* ¶¶ 19-20.

E.H.C.F.,[79] but Officer O'Donnell proceeds to indicate that she "would be taken into ICE custody if encountered."

Even assuming the above were true,[80] on these facts, it is unlikely that E.H.C.F. ever met the statutory definition of a UAC either. The Government's own declaration admits that Ms. Contreras Flores was physically present at the time of E.H.C.F.'s arrest and was not taken into custody, yet E.H.C.F. was not released to her. The declaration further suggests that she was later instructed to report to ICE under the ostensible purpose of retrieving her son, while simultaneously admitting that she would be taken into custody if she did so. On this record, the Court is deeply troubled by the apparent sequence of events, which—at minimum—raises serious questions as to whether E.H.C.F.'s designation as a UAC resulted not from the absence or unavailability of a parent, but from the government's own actions in declining to release him to an available parent and placing that parent in a position where attempting to obtain physical custody would result in her detention.[81] Accordingly, the Court concludes that the statutory term UAC likely does not apply to E.H.C.F. under either version of events.

---

[79] *See* ECF No. 50 at 4 ("Ms. Flores indicated that she would take custody and care of Petitioner…and was told to report to ICE ERO on May 9, 2025, by 8:00 a.m.")

[80] The Court notes that the Government fails to produce any evidence in support of its declarations, including the purported records the declarants rely on. The Court also notes that the Government previously submitted contradicting assertions as to how it came to designate E.H.C.F. as a UAC. *See, e.g.,* ECF No. 25 at 5 ("Mother could not be located or contacted," though it now contends Ms. Contreras Flores was indeed contacted); *see id.* ("ORR accepted this referral after the child's father was detained by DHS and the mother failed to report to ERO at the requested time," though it now contends that Ms. Contreras Flores would have been detained had she shown up).

[81] To the extent the Government suggests that minor children may be classified as UACs simply because their parents do not have lawful immigration status and may be detained by ICE, as Petitioner-Plaintiff correctly points out, such a rule would "[fly] in the face of the statute." ECF No. 52 at 8. "The HSA does not make any reference to a parent's immigration status as part of the definition of 'available,' and for good reason. Respondents' proposed rule would render thousands

Respondents-Defendants' claims that ORR cannot release E.H.C.F. before final determinations on dangerousness have been made presuppose that E.H.C.F. is a UAC. However, "no provision of the HSA or TVPRA appears to empower ORR to detain a child who," like E.H.C.F., "is not a UAC." *Maldonado v. Lloyd*, No. 18-CV-3089, 2018 WL 2089348, at *6 (S.D.N.Y. May 4, 2018). Without statutory power, ORR has no authority over E.H.C.F. *See id.* (citing *City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 187 (2d Cir. 2010) ("But 'an agency literally has no power to act ... unless and until Congress confers power upon it.'" (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).

And even if E.H.C.F. was briefly properly categorized as a UAC at the time of his initial detention, the Court finds that it is likely that he no longer qualifies as a UAC now. The Government argues that once a child is designated unaccompanied, that designation cannot be challenged. *See generally D.B. v. Cardall*, 826 F.3d 721 (4th Cir. 2016). "But that is not settled law," and as a matter of statutory interpretation where the parent's fitness is not disputed, it is reasonably likely that E.H.C.F. no longer falls under § 279(g)(2). *Souza v. Sessions*, No. 18-CV-4412, 2018 WL 10436697, at *2 (N.D. Ill. June 28, 2018). Here, Ms. Contreras Flores's fitness is not disputed, and she "had previously sponsored two or more children."[82] The agency's own prior determinations that she was a suitable sponsor for E.H.C.F.'s siblings only

---

of children currently living with their parents 'unaccompanied' in the eyes of the government. Moreover, nothing in the HSA or TVPRA authorizes ORR to inquire into immigration status as a condition for sponsorship…If ORR is prohibited from denying a sponsorship application, which includes extensive vetting for sponsorship suitability, based solely on immigration status, then DHS certainly may not render a parent 'unavailable' solely by virtue of immigration status." *Id.*

[82] ECF No. 25-1 ¶ 23.

21

strengthen the Court's conclusion that E.H.C.F. is likely not a UAC, as he has a parent available to provide care and physical custody.

Thus, the Court finds that Petitioner-Plaintiff is likely to succeed in showing that he was never properly classified as a UAC or not properly classified as a UAC now, and that ORR thus does not have the statutory authority to hold him in custody.

### b.    Substantive Due Process Claims

The Court finds that Petitioner-Plaintiff is likely to succeed on the merits of his Fifth Amendment substantive due process claims. Indeed, the Court finds that E.H.C.F. has a protected liberty interest in being reunited with his mother. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000). Courts have repeatedly held that it is a violation of substantive due process under the Fifth Amendment to separate children from parents absent a clear showing that the parent is unfit or is otherwise endangering the child. *See, e.g., J.S.R. by and through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 741 (D. Conn. 2018) (finding likely substantive due process violation when government separated immigrant children from parents). As in *J.S.R.*, the Government here has failed to establish "a compelling reason for depriving [E.H.C.F.] of their family integrity—depriving them of their primary and only consistent source of support—or that its policy was narrowly tailored to achieve that compelling reason." *Id.* at 741-42. Indeed, other than "additional vetting" and vague references to an ongoing coordinated multi-agency law enforcement investigation addressing safety concerns, the Court does not understand why E.H.C.F. is being separated from his mother. Thus, Petitioner-Plaintiff is likely to succeed on the merits of his Fifth Amendment claim.

22

### c.    Procedural Due Process Claims

The Court concludes that E.H.C.F. is likely to succeed on his claim that his continued detention and separation from his mother violates his right to due process under the Fifth Amendment.

"The Due Process Clause 'imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests within the meaning' of the Fifth Amendment." *Barrows v. Burwell*, 777 F.3d 106, 113 (2d Cir. 2015) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)). The Due Process Clause "applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zavydas v. Davis*, 533 U.S. 678, 693 (2001).

In evaluating alleged violations of procedural due process arising under the Fifth Amendment, the Second Circuit has employed the balancing test set forth by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976). See *Weinstein v. Albright*, 261 F.3d 127, 136 n.8 (2d Cir. 2001). Under the *Mathews* framework, a court must consider:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335.

With respect to the first *Mathews* factor, the Second Circuit has long recognized the private interest affected here. The "right to the preservation of family integrity encompasses the reciprocal rights of both parent and children." *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977). Children have a "constitutionally protected liberty interest in not being

23

dislocated from the emotional attachments that derive from the intimacy of daily family association." *Kia P. v. McIntyre*, 235 F.3d 749, 759 (2d Cir. 2000) (cleaned up); *see also Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2012) (parents "have a constitutionally protected liberty interest in the care, custody and management of their children" (quoting *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999))). Here, E.H.C.F. and his mother have been separated for more than eight months. There is no doubt that Respondents-Defendants' actions have "encroached" upon E.H.C.F.'s right to family integrity "considerably." *See Beltran v. Cardall*, 222 F. Supp. 3d 476, 482 (E.D. Va. 2016).

As to the second *Matthews* factor, the Court reviews the process provided to Petitioner-Plaintiff thus far. E.H.C.F. has been in ORR custody since May 11, 2025. On or about May 23, 2025, Ms. Contreras Flores submitted her sponsorship application, indicating her desire to reunite with E.H.C.F. A home study was conducted in June and resulted in a positive recommendation. A second home study was conducted in December and also resulted in a positive recommendation. Between May and December 2025, Ms. Contreras Flores, Keren, and Mr. Contreras Romero have complied with numerous background checks, identification requirements, and biometric appointments. Ms. Contreras Flores has submitted to DNA testing. Keren submitted no less than six forms of identification (her Honduran passport, authenticated by the Honduras consulate, birth certificate, high school ID, library card, college ID, and Employment Authorization Document). Indeed, the Government makes no assertions that Ms. Contreras Flores or any other family member have refused to comply with any ORR

24

requirements.[83] Recommendations in support of E.H.C.F.'s release have been submitted by Noank, Noank's clinician, E.H.C.F.'s Child Advocate, and ORR FFS Ruth Yanez.

On December 30, 2025, as described in Section I.A.3.e, *supra*, the Government first raised safety concerns as a possible barrier to E.H.C.F.'s release. But they were aware of these concerns since the day E.H.C.F. entered ORR's custody, on May 11, 2025. The Government indicated that they began considering these concerns as a barrier based on E.H.C.F.'s second disclosures about them in mid-September. But they did not communicate this to Petitioner-Plaintiff's counsel until December 30, 2025, until after the underlying habeas petition and the Motion were filed with this Court. The Government further represented, at the January 15, 2026 hearing, that they are conducting an investigation as to these safety concerns. But they could not articulate what the investigation consists of, and why it could not have been undertaken in May or even September of 2025.

The record also reveals that ORR remanded its decision on E.H.C.F.'s release *at least* three times, each time with no explanation. Worse yet, ORR *twice* indicated to Ms. Contreras Flores that it would release E.H.C.F., only to reverse both times, again, with no explanation.[84]

"This process displays several significant deficiencies, in view of the magnitude of the private interest at stake." *Maldonado*, 2018 WL 2089348, at *8. As an initial matter, Respondents-Defendants have not made adequate disclosures to Ms. Contreras Flores about

---

[83] At most, Respondents-Defendants assert that Ms. Contreras Flores failed to disclose the presence of Mr. Contreras Romero in the home. But they provide no evidence that she was ever notified of such "requirement." And it has already been *four* months since ORR found out about his presence in the home, which is in and of itself a significant delay.

[84] At the January 15, 2026 hearing, the Government "speculated" that the September reversal may have been based on the discovery of Mr. Contreras Romero in the home, but did not offer a firm explanation.

ORR's decision-making. For example, Ms. Contreras Flores has received no reason behind the three remands ORR made in December, let alone of the full-on *reversals* of their decisions to release E.H.C.F. to his mother. Additionally, ORR's determination has been inordinately and inexplicably delayed. E.H.C.F. has been in ORR custody for more than eight months, and Ms. Contreras Flores first submitted her sponsorship application in May 2025. Even measuring from September 2025, when ORR discovered the presence of Mr. Contreras Romero in the home and E.H.C.F. raised safety concerns for the second time, four months have now passed. Yet ORR has still not rendered a final decision on Ms. Contreras Romero's sponsorship application. Their vague explanation as to the delay—that additional vetting is required and that an "investigation" as to safety concerns needs to be completed—does not comport with basic procedural due process.

Finally, other courts have found that when a parent (rather than another relative or a friend) seeks reunification with her child, ORR procedures improperly place the burden of proof on the parent to demonstrate suitability rather than on ORR to justify its continued custody of the child. *See Santos v. Smith*, 260 F. Supp. 3d 598, 613 (W.D. Va. 2017) ("[W]hen a parent is requesting reunification, the burden should be on ORR to show why its continued custody of a UAC is appropriate, rather than placing that burden on the parent."); *Beltran*, 222 F. Supp. 3d at 485 (finding process inadequate because "[a]t no point was the onus on ORR to justify its deprivation of Petitioner's fundamental parental rights"). In this case, the Court agrees that ORR's procedures improperly place the burden on Ms. Contreras Flores, especially in light of the uncontested fact that E.H.C.F. was living with her prior to his arrest.

To summarize, "the deficient procedures employed by ORR created a significant risk" that E.H.C.F. "would be erroneously deprived of [his] right to family integrity." *Beltran*, 222

F. Supp. 3d at 488. "This risk could have been mitigated by additional procedural safeguards," including enhanced transparency regarding ORR's decision-making, an expedited suitability determination, and adjusting the burden of proof to account for the important private interest at stake. *Id.* Accordingly, Respondents-Defendants "must demonstrate that an extraordinarily compelling interest justified ORR's failure" to provide additional or substitute procedures. *Id.* At this point in time, they have not done so.

Turning to the third *Matthews* factor, the "most obvious Government interests here are protecting the welfare of children and the safety of the public." *Maldonado*, 2018 WL 2089348, at *10 (citing *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1199-1200 (N.D. Cal. 2017) (in case involving detention of UACs previously released to sponsors, recognizing the Government's asserted interests in "public safety and welfare, including the welfare of the minor")). But as in *Maldonado*, Respondents-Defendants here fail to "identif[y] what burden it would impose on ORR to provide more process to [E.H.C.F.] (or children like him) and parents who seek reunification with their children." *Id.* (cleaned up). Nor have they "indicated the number of children currently in ORR custody who, like [E.H.C.F.], are detained over the objection of an available parent." *Id.* Thus, the Court cannot determine "the burden on ORR of, for example, holding hearings, making more expeditious decisions, etc." *Id.* (cleaned up). "Whatever burden additional or substitute procedures might impose, however, 'is not sufficient to overcome the first two factors of the *Mathews* test in this instance.'" *Id.* (citing *Beltran*, 222 F. Supp. 3d at 489).

Accordingly, the Court concludes that E.H.C.F. is likely to succeed on the merits of his procedural due process claims.

27

### 3.    Public Interest and Balance of Equities

The Court concludes that the balance of equities tips in Petitioner-Plaintiff's favor, and that the public interest would not be disserved by the issuance of a preliminary injunction.

The final two factors for injunctive relief—the balance of hardships and public interest— "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also, e.g., New York v. DHS*, 969 F.3d 42, 58-59 (2d Cir. 2020). Here, Petitioner-Plaintiff faces numerous hardships, namely the deprivation of his constitutional and statutory rights to family unity, the deprivation of his liberty, deteriorating mental health, and educational deprivation. It is unclear to the Court what hardship the Government will face by releasing E.H.C.F. to the custody of his mother. The representations to Ms. Contreras Romero about his impending release in both September and December show that there would be little financial or administrative burdens on the Government to release E.H.C.F. But his continued detention holds the risk of substantial constitutional harm. *See Mahdawi v. Trump*, 136 F.4th 443, 455 (2d Cir. 2025) (finding, in the context of detaining a individual in the process of applying to become a citizen, when a court is "[f]aced with such a conflict between the government's unspecific financial and administrative concerns on the one hand, and the risk of substantial constitutional harm to [the individual] on the other, we have little difficulty concluding 'that the balance of hardships tips decidedly' in [his] favor.")

The public has a strong interest in the government's compliance with 8 U.S.C. § 1232(c)(3)(A), which is designed to ensure the well-being of children in government custody. But in light of the Court's preliminary findings raising serious questions about whether Respondents-Defendants are complying with that statute, other governing statutes, and their own regulations—and whether E.H.C.F. is properly designated as a UAC such that ORR has

28

lawful custody—the Court concludes that the public's interest in safeguarding the constitutional right to familial integrity outweighs this competing interest. While the Court also acknowledges the Government's interest in protecting the public, those concerns are alleviated here, in light the extensive record of internal recommendations that E.H.C.F. be released, the safety plan developed by E.H.C.F.'s parents, and the Discharge Plan provided by Noank.

Accordingly, the Court concludes that the final two factors weigh in favor of Petitioner-Plaintiff.

## IV.    **CONCLUSION**

For the foregoing reasons, the Motion is **GRANTED.** Petitioner-Plaintiff shall be released into the custody of his mother, Mileidy Yamaly Contreras Flores, by **January 18, 2026 at 09:00 A.M.** No bond is required for his release.

**SO ORDERED.**

Hartford, Connecticut
January 16, 2026

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge

29